IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Mary Taylor, | Case No. 3:12 CV 241 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Fidelity National Insurance Company, | |
| Defendant. | |

## INTRODUCTION

This is a fire loss case. Plaintiff Mary Taylor, the property owner, sued her insurance carrier who denied her claim. Pending before this Court is Defendant Fidelity National Insurance Company's ("Fidelity") Motion for Partial Summary Judgment (Count I) as to Plaintiff's claim for breach of contract (Doc. 27). Plaintiff opposes (Doc. 29). For the reasons stated below, Fidelity's Motion is denied.

## BACKGROUND

Plaintiff owned a house located at 1346 Grand Avenue, Toledo, Ohio 43606 (the "Property"). Plaintiff purchased the Property in June 2010 from Michael Taylor II for $24,000 (Doc. 25-1, Taylor Examination Under Oath ("EUO") at 43). Plaintiff grew up knowing Michael Taylor II as her "uncle," although he is not a blood or legal uncle (Doc. 26-1, Taylor Dep. at 17). Plaintiff's father and Michael Taylor II's mother were raised together, although Plaintiff is unsure whether her mother and Michael Taylor II's father were any relation (*id.*). Michael Taylor II owned and continues to own a number of houses on Grand Avenue (Taylor EUO at 129–30).

In April 2010, Michael Taylor II's son, Michael Taylor III, was charged with killing a rival gang member (Taylor EUO at 130–31). On January 10, 2011, at approximately 1:30 p.m., the home at the Property was set on fire, allegedly in retaliation for the murder allegedly committed by Michael Taylor III (Taylor EUO at 65; Compl. at ¶¶ 3-4). At the time of the fire, Plaintiff and Michael Taylor II were at the Lucas County courthouse for a court hearing in connection with Michael Taylor III's murder prosecution (*id.*). Fidelity has not disputed the cause of the fire. The home at the Property was demolished immediately after the fire because it was deemed to be an unsafe structure (Taylor EUO at 140). Plaintiff claims she lost everything in the fire. There is a dispute between the parties about whether Plaintiff and her children lived at the Property at the time of the fire (*see* Doc. 27-2). There is also a dispute about whether other adults lived at the Property at the time of the fire (*id.*). Plaintiff claims she lived at the Property with her children and Montelle Taylor, another son of Michael Taylor II, who rented space in the house from Plaintiff.

Fidelity issued a home owner's insurance policy to Plaintiff for the Property effective November 15, 2010 (the "Policy") (Doc. 27-3). The policy covered structural damage/loss up to $133,000 for the dwelling and personal property damage/loss up to $99,750 (*id.*).

Some six weeks after the fire, on February 28, 2011, Plaintiff submitted a Sworn Proof of Loss to Fidelity (Doc. 27-5). The Proof of Loss, totaling some $60,000, included a 9-page handwritten itemized list (the "First Inventory") of personal property destroyed by the fire, as well as estimates of the quantity, date of acquisition, and purchase price of each identified item (*id.* at 4–12).

Shortly after submitting the First Inventory, Plaintiff hired licensed public adjustor, David Fruth, to perform a new inventory (the "Second Inventory") (*see* Doc. 29-2). Fruth, a claims professional, determined the actual cash value and replacement cost (as opposed to the purchase price)

2

of Plaintiff's personal property and assisted Plaintiff in recalling items (*id.*; Taylor Dep. at 67). The Second Inventory, a 31-page document, itemized the contents of each room in the home and provided estimated replacement cost and actual cash value for each item (Doc. 29-2). Fruth estimated the total replacement cost value for the personal property lost by Plaintiff to be $50,225.30 and the actual cash value to be $34,524.86 (*id.*). Fruth left off some items from the Second Inventory that were included in the First Inventory (*id.*).

Plaintiff submitted the Second Inventory to Fidelity on July 7, 2011 to replace the First Inventory, and Fidelity never objected to the submission of the Second Inventory (Doc. 28-1, Jones Dep. at 30). Jeremy Jones, the residential property claims supervisor at Fidelity assigned to Plaintiff's claim, testified that he understood the Second Inventory was intended to replace the First Inventory (*id.*). Jones acknowledged that adjustors typically do a better job pricing and organizing contents inventory than insureds (*id.* at 31).

In a letter dated December 13, 2011, Fidelity denied Plaintiff's claim in connection with the fire (Doc. 27-2). The letter cited a provision in the Policy's terms and conditions stating that Fidelity would not provide coverage if, before or after a loss, the insured has (1) "[i]ntentionally concealed or misrepresented any material fact or circumstance," (2) "[e]ngaged in fraudulent conduct," or (3) "[m]ade false statements[] relating to this insurance" (*id.* at 1). In the letter, Fidelity alleged that Plaintiff made the following misrepresentations in connection with her claim (*id.* at 1–2):

- Plaintiff submitted an inflated personal property claim for the contents of her home. In particular, in reviewing Plaintiff's income tax statements from 2009 and 2010, Plaintiff did not have sufficient disposable income to acquire the items she listed as acquired during those years.

3

- Plaintiff misrepresented who was residing at the Property. Plaintiff told Fidelity that only she, her children, and renter Montelle Taylor resided at the Property at the time of the fire. However, two other individuals, Christian Snow-Valley and Donnie Harris, made statements that they also resided at the Property, and, in fact, those two individuals made insurance claims under renter's insurance policies listing the Property as their residence.

- Plaintiff misrepresented her relationship with Michael Taylor II. Plaintiff testified that Michael Taylor II is her uncle. However, statements from Snow-Valley indicated that Plaintiff and Michael Taylor II were engaged in a romantic relationship and shared a bedroom at the Property. In addition, an article in the *Toledo Blade* about the subsequent murder of Montelle Taylor identified Michael Taylor II as Plaintiff's boyfriend.

- Plaintiff misrepresented that she occupied the Property. Water and electrical bills for the Property were in the name of Michael Taylor. Plaintiff also entered into a residential lease agreement for an apartment on Lewis Avenue in Toledo, Ohio beginning on July 16, 2010, about six months before the fire at the Property. The Ohio Bureau of Motor Vehicles sent vehicle registration information to the Lewis Avenue apartment in August 2010.

After receiving the denial letter, Plaintiff filed the instant action in Lucas County Common Pleas Court, bringing claims for breach of contract and lack of good faith against Fidelity (Doc. 1-1). Fidelity removed the action to this Court and filed a Counterclaim for unjust enrichment for $38,161.53 advanced to Plaintiff under the Policy (Doc. 12).

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, this Court must draw all inferences from the record in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). This Court is not permitted to weigh the

evidence or determine the truth of any matter in dispute; rather, this Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

## DISCUSSION

In its Motion, Fidelity argues Plaintiff made, *as a matter of law*, at least six statements constituting material misrepresentations, thereby enabling Fidelity to deny coverage (*see* Doc. 27-1 at 1–2). Fidelity argues it is entitled to deny coverage because Plaintiff breached the Policy when she (1) "[i]ntentionally concealed or misrepresented any material fact or circumstance," (2) "[e]ngaged in fraudulent conduct," or (3) "[m]ade false statements[] relating to this insurance" (*id.* at 1). Fidelity identified the following alleged misrepresentations for which it claims no disputed issues of material fact exist and that the misrepresentations are material as a matter of law (*id.* at 1–2):

- Plaintiff misrepresented her purchase of the Property for $24,000.

- The First Inventory misrepresented the amount of personal property Plaintiff purchased in 2009 and 2010.

- The differences between the First Inventory and the Second Inventory constitute misrepresentations.

- Related to the prior statement, Plaintiff made different claims about six specific items in the Second Inventory as she did in the First Inventory.

- Plaintiff later admitted she does not believe the Second Inventory is accurate, even though she verified the Second Inventory's accuracy when she signed it.

- Plaintiff misrepresented the rent she may have received from Montelle Taylor.

"[F]alse answers are material if they might have affected the attitude and action of insurer, and they are equally material if they may be said to have been calculated either to discourage, mislead, or deflect the company's investigation in any area that might seem to the company, at that time, a

5

relevant or productive area to investigate." *Nationwide Mut. Ins. Co. v. Skeens*, 2008 WL 1759101, at *2 (Ohio Ct. App. 2008); *see also Moss v. Nationwide Mut. Ins. Co.*, 24 Ohio App. 3d 145, 149 (1985). The question central to Fidelity's Motion is whether this Court can conclude from the record before it *as a matter of law* that Plaintiff's statements constitute material misrepresentations. This Court cannot make such a finding.

### *Purchase Price of the Property*

Plaintiff testified she purchased the Property for $24,000 and that she paid the entire $24,000 between July 2009 and July 2010 (Taylor EUO at 43). Fidelity contends this purchase is impossible because Plaintiff did not have disposable income equaling $24,000 during that time. Fidelity engages in an analysis of Plaintiff's reported income on her tax returns for 2009 and 2010 and other possible sources of income (food stamps and possible rental income). However, Fidelity's analysis is problematic on several fronts. First, Fidelity's computation assumes that Plaintiff lived hand-to-mouth on cash during 2009 and 2010 and does not take into account any money Plaintiff had accumulated prior to 2009 (i.e., savings). Further, Fidelity does not account for unreported income Plaintiff testified she received for providing salon-type services for friends and family, which Plaintiff testified equaled $15,000–20,000 annually (Taylor EUO at 38), or whether some of the items were purchased by other individuals as gifts to Plaintiff. Simply put, Fidelity's computations are not conclusive evidence of Plaintiff's disposable income during 2009–10. This is an issue of fact.

### *The Amounts of the First and Second Inventory*

Using this same flawed income analysis, Fidelity argues that Plaintiff could not have made the purchases she contends were made in 2009–10 on her First and Second Inventory. As discussed

6

above, the computation is flawed, precluding a conclusive finding that Plaintiff misrepresented the Inventories.

### *Differences Between the First Inventory and the Second Inventory*

Fidelity makes a few arguments in connection with differences between the two inventories. First, Fidelity argues the differences between the two inventories themselves constitute material misrepresentations. This cannot be so. Fidelity's representative testified that Fidelity accepts revised inventories and understood Plaintiff to be doing just that with her Second Inventory (Jones Dep. at 21 & 30). The mere existence of the revised inventory cannot constitute a material misrepresentation as a matter of law. Plaintiff testified she intended to use the Second Inventory as her final submission (Taylor Dep. at 11– 4) and Fidelity accepted it as such (Jones Dep. at 30).

Fidelity also points to six specific items and discusses the differences between the two inventories in connection with each item. Fidelity instructed Plaintiff to provide the purchase price she believes was paid for each item on the First Inventory (Taylor Dep. at 10–11, 61–62). Plaintiff did not have the benefit of any receipts or photos and could not view the personal property because everything had been destroyed by the fire (Taylor EUO at 45, 140). Plaintiff consistently testified she did the best she could when completing the First Inventory. Plaintiff's First Inventory was an attempt to estimate the purchase price of individual items, prompted by Fidelity's own instruction.

Plaintiff then decided to hire Fruth to assist her with a Second Inventory. Fruth assisted Plaintiff in recalling when she purchased certain items (Taylor Dep. at 67). Fruth corrected earlier mistakes Plaintiff made in regard to timing of purchases, and then completed the Second Inventory using an actual cash value and replacement cost methodology (Doc. 29-2). (Actual cash value, replacement cost, and purchase price are all different methods of valuing an item.)

7

Issues of fact exist regarding each of the six specific items identified by Fidelity in its Motion, including why certain items were included or excluded on the Second Inventory and whether the omissions or additions constitute material misrepresentations. This Court notes, however, that Fidelity's argument that Plaintiff's listing of a 50-inch television on both inventories constitutes a material misrepresentation because Plaintiff later testified her sister and brother-in-law purchased the television for her. So what? The television was apparently a gift for which Plaintiff can be compensated. *See* BLACK'S LAW DICTIONARY (9th ed. 2009) (defining "gift" as "[t]he voluntary transfer of property to another without compensation").

### *Plaintiff's Signature on the Second Inventory*

Fidelity makes much of the fact that Plaintiff reviewed and signed the Second Inventory yet testified that some inaccuracies exist in the Second Inventory. Again, should there be a mistake on the Second Inventory, it is an issue of fact as to whether the mistake would constitute a material misrepresentation.

### *Rent Proceeds from Montelle Taylor*

During her statement under oath, Plaintiff claimed that Montelle Taylor paid $250 rent to live at the Property (Taylor EUO at 28). Yet, during her later deposition, she testified that Montelle Taylor gave her money "every now and then" (Taylor Dep. at 40). Fidelity claims this discrepancy constitutes a material misrepresentation. This Court does not perceive the two statements as entirely inconsistent, and, in any event finds an issue of fact exist as to whether the statements constitute a material misrepresentation.

8

**CONCLUSION**

For the reasons stated above, Fidelity's Motion for Partial Summary Judgment (Count I) (Doc. 27) is denied. Pursuant to the prior consent of the parties (Doc. 30), this case is transferred to Magistrate Judge Knepp for further proceedings.

IT IS SO ORDERED.

   s/ *Jack Zouhary*  
JACK ZOUHARY  
U. S. DISTRICT JUDGE

December 4, 2012